BYRNES, Judge.
This appeal arises out of a judgment of the Juvenile Court for Orleans Parish permanently severing the parental rights of Dianne and Elijah Gray pursuant to the provisions of LSA-R.S. 13:1601(A), (C), and 1602(D).
Dianne Gray was previously convicted, in Criminal District Court, of cruelty to a juvenile under LSA-R.S. 14:93, as to her daughter (“X”) and acquitted regarding her son (“Y”). Elijah Gray, the father, was acquitted of similar charges as to both children. Subsequent to the criminal trial, this action to terminate parental rights was filed in Juvenile Court.
After a lengthy trial, the court specifically found Dianne and Elijah Gray guilty of simple battery, aggravated battery, and/or negligent injury. The trial judge held that the state, had satisfied its burden of proof under R.S. 13:1601(A)(1), (2) and (C)(2) and therefore terminated the Grays’ parental rights.
Both parents filed separate briefs to this court, alleging that the trial court abused its discretion in terminating their parental rights.
FACTS
The trial judge, in her reasons for judgment which are outstanding for their thoroughness and well reasoned analysis, recites the full history of this case:
The abuse of (“Y”) and (“X”) first came to the attention of the authorities at Andrews Air Force Base in Maryland in July of 1981. Both children were hospitalized from July 23, 1981, to July 28, 1981, as a result of the reported abuse. At that time, (“X”) had a one-inch cut in the center of her forehead, her left eye was blackened, and both of her hands were swollen. (“Y”) had a swollen foot. (“X”) attributed her injuries to her mother’s hitting her and (“Y”) said his father *885 had stepped on his foot. The treating physician said that the bruises on the children were compatible with child abuse. Both children were reported to be afraid of their parents.
Captain John D. Smith Jr., USAF, MSW, tried to help the parents, but to no avail. Elijah Gray denied any abuse, saying that (“X”) hurt her hands by picking up and dropping a sofa on them, which sofa Captain Smith was subsequently unable to lift himself. Elijah Gray also said that (“X”) hands were not swollen when he had last seen her that morning, the same statement he made in respect to her later injuries in New Orleans. He further stated that (“X”) got her back eye by playing with a 5-week old poodle and that (“Y”) was “faking” his limp. Dianne Gray also denied the abuse, was hostile and angry, and generally would not speak to Captain Smith. Mr. and Mrs. Gray felt, and contunue to feel, that the Air Force personnel were “messing with them,” and they remained hostile and resistive to assistance and treatment. They would not attend the Parents Anonymous group meetings, as suggested by Captain Smith, nor would they even check out a book on parenting from the base library. (Mr. Gray later testified that this was because he and his wife had both been to “medical school” and had books on children at home. None of these alleged books were ever produced at trial, however.) Mr. and Mrs. Gray even refused to tell Captain Smith where they were relocating to upon Elijah Gray’s “separation” from the Air Force, which occurred in September, 1981.
After Elijah Gray’s “separation” from the Air Force in September of 1981, the family returned to New Orleans, where they set up residence. The Air Force authorities were very concerned about the situation and made contact with the Office of Human Development (OHD) in New Orleans. Following up on the referral, Ms. Fadge Flowers, OHD, made contact with the family by visiting the home, unannounced, where she was greeted with hostility and anger on the part of Mrs. Gray. Mrs. Gray flatly denied any abuse and said she didn’t need any services. The case was kept open by means of telephone contacts, which were generally uneventful. The case was subsequently transferred to Ms. Patrice Green, OHD, who has a Master’s Degree in Metal Health. On September 13, 1982, the OHD had Elijah Gray evaluatyed by Dr. Brian Jordan, a clinical psychologist. (Dianne Gray refused to be evaluated, and the Grays refused to have (“Y”) evaluated, saying that (“X”) was the problem.)
Virtually immediately after this evaluation took place, the children again showed signs of abuse. (“X”) was reported to be at school, bruised and limping. Both children were taken into state custody and were taken to be examined by Dr. Winston Levy (on 9-16-82) and by Dr. Elijah Sproles (on 9-20-82). Physical examination of the children revealed “indisputable findings of inflicted traumas,” according to Dr. Sproles. (“X”) displayed linear lesions on both sides of her mouth which were quite characteristic of having been gagged with something that was placed in her mouth and tied behind her head. (Those marks were so characteristic that Dr. Sproles later had them photographed for his teaching file.) She also had injuries to her right eye — reminiscent of the blackened left eye she was observed to have in Maryland, approximately one year earlier — as well as many bruises, abrasions, scars in vaious stages of healing on her chest and back, a large bruise on her chest, swelling over the middle of the radial area of her right arm, a swollen left foot reminiscent of (“Y’s”) swollen foot in Maryland, multiple loop and linear marks, and a healed scar on her buttocks. X-rays of (“X”) revealed a sinus fracture in the right eye area and a healing fracture of the right arm. When questioned about the healed scar on her buttocks, (“X”) stated that her mother had burned her with a hot comb. The physician felt that this expía- *886 nation was compatible with the injury. When questioned about her other injuries, (“X”) explained that she had been hit by her mother with a hammer on her face and back and foot and also with a belt and that she had been gagged, apparently to prevent her from crying out. The physician felt that the injuries were compatible with what the child described and, further, that they were not compa-taible with playground injuries or roughhousing. (emphasis in original)
As in Maryland, (“Y’s”) injuries were not as severe as (“X’s”) were. He had bruises on his hips and legs and back, which he explained by saying he was hit with a hammer. His injuries were consistent with this explanation. It should be noted that the children were examined and questioned separately, so that neither heard the other’s explanation at the hospital.
Throughout the time the children have been in state custody, they have generally held to these accounts. (“Y”) told Ms. Peggy Whitmarsh, MSW, on December 16, 1983, that he was hit on the back by his mother with a hammer and by his father with a belt. In October of 1983, both children told Dr. Karen Alleyne, a psychiatrist, that they did not want to see or talk to their parents. On September 30, 1983, (“X”) told Dr. C.S. Cowar-din, a psychiatrist, that she was afraid even to visit with her parents. On September 28, 1982, (“Y”) told Dr. Brian Jordan, a psychologist, that his parents beat him with a belt, a hammer, and various other objects, and that his father once hit him with a chair. On September 28, 1982, (“X”) told Dr. Jordan that her parents beat her and that her father gagged her and that she did not want to return to live with her parents. In this court, on January 17, 1984 (“X”) said that Dianne Gray hit her with a hammer on her back, legs, eye, etc., and that Elijah Gray was present when this took place. She also testified that Elijah Gray gagged her with a sock and whipped her with a belt and with a white stick. She further stated that she doesn’t want to go back home because her parents will hit her again. On the same date, (“Y”) testified that both he and (“X”) were beaten with belts by their mother and their father. Although (“X”) got somewhat confused on cross-examination, the Court feels this was due to lack of attention, more than anything else, on her part. She is now only seven (7) years old, and the abuse took place when she was five (5) years old. Also, the Court feels that (“Y”) in-court denial of being hit with a hammer, coming as it does at this late stage, is the result of either repression of the memory of the incident on his part or, more probably, his belated realization of the consequences of his statement, especially if he returned to his parents. The Court agrees with Dr. Cowardin that the statements made by the children immediately after the abuse are most likely to be true. (Record, 507-512)
BURDEN OF PROOF
The State’s burden of proof in this case is set forth in LSA-RS. 13:1601(A) and (C) which provide as follows:
The Court, on its own motion may order that the district attorney petition, or the district attorney in his discretion may petition, for the termination of parental rights of the parent or parents of an abused, neglected, or other child within a juvenile court’s jurisdiction, when the grounds set forth in the petition meet all the conditions of Subsection A, B, C, D, or F of this Section. The district attorney may appoint any attorney representing the Department of Health and Human Resources as a special assistant district attorney for the purpose of prosecuting any such case, regardless of the domicile of said special assistant.
A. (1) The abuse or neglect of the child by the parent or parents results from a crime committed against the person of the child or when a parent is an accessory to such a crime.
(2) The abuse or neglect of the child by the parent or parents consists of cruel *887 and inhuman treatment which is below a reasonable standard of human decency.
(3) The parent is unfit to retain parental control and there is no reasonable expectation of reformation on the part of the parent or parents.
C. (1) The abuse or neglect of the child by the parent or parents results from grossly negligent behavior which directly harms the child.
(2) The abuse or neglect of the child by the parent or parents consists or persistent cruel and inhuman treatment which is below any reasonable standard of human decency.
(3) The parent is unfit to retain parental control and there is no reasonable expectation of reformation on the part of the parent or parents.
LSA-R.S. 13:1603 provides in pertinent part:
A. Whenever the court of proper jurisdiction finds that the allegations of Subsections A, B, C, D, E, or F of R.S. 13:1601 are proven true by the evidentia-ry standards set forth in this Section, it may order the termination of parental rights of the parent or parents against whom the allegations are proven.
Under Subsection A of R.S. 13:1601, Paragraph (1) must be proven beyond a reasonable doubt. Paragraphs (2) and (3) must be proven by clear and convincing evidence ...
Under Subsection C of R.S. 13:1601, Paragraph (1) must be proven beyond a reasonable doubt. Paragraphs (2) and (3) must be proven by clear and convincing evidence.
Appellants contend that the state failed to meet its burden of proof. We disagree.
Under R.S. 13:1601(A) the state has proven beyond a reasonable doubt that the abuse of (“X”) stemmed from a crime committed against the child’s person. In fact, Mrs. Gray was convicted of Cruelty to a Juvenile in Criminal District Court. However, neither the acquittal of Mrs. Gray regarding her son, nor Mr. Gray’s aquittal on similar charges prevents the juvenile court from finding independently that crimes were or were not committed by the parents against the children.
R.S. 13:1601(A)(1) specifically creates an avenue for the court to find criminal conduct. The Legislature’s 1976 amendment of the statute deleting the requirement of proof of a parent’s prior conviction of a crime against the child suggests its intent to allow the juvenile court to make such findings independent of the Criminal Court. .Thus, we find appellants’ argument that their respective aquittals in Criminal Court prevent similar Criminal findings by the Juvenile court to be unpersuasive and without merit.
FINDINGS OF THE TRIAL COURT
In making its findings of fact the trial court stated:
After considering all of the evidence, this court is convinced that — at the very least —(“X”) and (“Y”) were beaten by Dianne Gray with a hammer, that Elijah Gray was present when (“X”) was beaten with the hammer, that Elijah Gray gagged (“X”) with a sock and beat her with a belt, and that (“Y”) was beaten with a . belt by Elijah Gray. It is simply too ridiculous for words to assume that these children confected a story so completely compatible with their injuries, when they were only five (5) and six (6) years of age, dispite Elijah Gray’s assertion that (“X”) is a “professional liar.” (tr-512) (emphasis in original)
The findings of fact of the trial court are clearly supported by the children’s testimony and by that of the doctors who have examined them throughout this period. Further, the testimony of the parents, continually finding other “explanations” for the children’s injuries, steadfastly refusing any help from social workers, and stating that their daughter is a professional liar is consistent with the pattern of behavior of parents who have abused their children and cannot be rehabilitated.
The various doctors who examined the parents unanimously found no hope of *888 their rehabilitation. The trial court summarized this testimony as follows:
During the course of this tiral, the Court heard testimony from many expert witnesses, some of them eminently well-qualified, including Major Robert Sanders, M.D., Dr. Brian Jordan, Dr. Karen Alleyne, Dr. C.S. Cowardin, Captain John D. Smith, Jr., M.S.W., and Dr. Lynn Simon. All of these experts testified that it was of paramount importance that abusive parents admit their problem and engage in therapy in order to learn how to modify their behavior. All were firmly convinced that in cases where the parents continue to deny the abuse, there is no possibility of rehabilitation. Dr. Al-leyne felt that there was no reason to ever try to reunite this family. Dr. Cow-ardin stated that she was absolutely certain that (“X”) should never be returned to Dianne and Elijah Gray. She added that the previous incident of abuse in Maryland and the parents’ lack of response thereto made her question whether (“Y”) could ever re-establish a relationship with his parents. She also testified that even if Elijah had not abused the children himself, he must acknowledge his duty to have protected them from abuse at Dianne’s hands. Dr. Sanders stated that he would not expect efforts to rehabilitate Elijah to be successful and further that as long as the parents continue to externalize the cause of their problem, the possibility of changing their behavior is “extremely unlikely.” He saw nothing to be gained by prolonging the situation as it is, and he added that his position would not change even if Dianne Gray were out of the home for a long time. Dr. Jordan described Elijah Gray as “untreatable,” due to his defensiveness and refusal to admit any problems, adding that he would have very little potential to recognize and prevent abuse by Mrs. Gray. To date, both parents have continued to deny any abuse. Elijah has never acknowledged his duty to protect the children from Dianne and stated that she did not do anything she should have been convicted for. He states that he does not believe the children had any injuries, and persists to this day in his belief that everyone is out to get him — the Air Force, Captain Smith, Dr. Sproles, Dr. Levy, the OHD workers, the courts, etc., etc., etc. The Court concludes that the requirements of LSA-R.S. 1601(A)(3) and LSA-R.S. 1601(C)(3) have been satisfied in that both of these parents are unfit to retain parental control and there is no reasonable expectation of reformation on the part of either parent. (Record-515-16)
Thus, it is abundently clear that Mr. & Mrs. Gray are beyond the point where they desire to or even can be rehabilitated into responsible, caring parents.
We join in the trial court’s finding that, considering the incidents of brutality against these children, the resulting lack of any bond between the children and their parents, and the fact that the parents are beyond rehabilitation, it is in the best interest of both children to terminate the parental rights of Dianne and Elijah Gray.
In conclusion, we further join in the trial court’s final statement in the reasons for judgment:
Considering .... that the subsequent abuse in Louisiana took place while the parents knew they were under the scrutiny of the OHD and only three (3) days after the evaluation of Elijah and (“X”) by Dr. Jordan, how could it possibly be in their best interests to return them, again, to Dianne and Elijah Gray, to face God alone knows what abuse next? What would these parents do for an encore? What more could these children be expected to endure? If returned to their parents, would they ever bother to complain about future child abuse? Would they live to? The emotional damage already done to these children will be compounded exponentially if they even have to consider the possibility of being returned to their parents at some future date, and the Court would become an accessory after the fact if it failed to terminate the parental right of Dianne and Elijah Gray. (Record-517)
*889 For the foregoing reasons the judgment of the trial court is affirmed. Costs of this appeal are to be borne by appellants.
AFFIRMED.